E-FILED
Thursday, 18 May, 2017 12:24:20 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| JOHN B. MCGLASSON, JR., | ) |
| Plaintiff, | ) |
| v. | ) Case No. 16-1259 |
| BYB EXTREME FIGHTING SERIES, LLC, a Florida limited liability company, MICHAEL VAZQUEZ, and DHAFIR "DADA 5000" HARRIS, | ) |
| Defendants. | ) |

# ORDER AND OPINION

This matter is now before the Court on Defendants' BYB Extreme Fighting Series, LLC and Michael Vazquez's Motion [9] to Dismiss, Plaintiff McGlasson's Motion [15] for Default Judgment and Entry of Default against Defendant Harris, and Defendant Harris' Motion [17] to Dismiss and Quash Service. For the reasons set forth below, Defendants' Motions [9] [17] are GRANTED and Plaintiff's Motion [15] is DENIED.

## BACKGROUND

On February 22, 2016, Plaintiff John B. McGlasson, Jr. ("McGlasson") filed a complaint for damages and equitable relief against BYB Extreme Fighting Series, LLC ("BYB"), Michael Vazquez, ("Vazquez"), and Dhafir "DADA 5000" Harris ("Harris") in the Circuit Court of the Tenth Judicial Circuit of Peoria County, Illinois. *McGlasson v. BYB Extreme Fighting Series, LLC, et al.*, Case No. 2016-CH-63 (Feb. 22, 2016). On June 14 and June 20, 2016, respectively, BYB and Vazquez were served with the Summons and Complaint. According to a process server's affidavit of service, Defendant Harris was served by way of substitute service on June 18, 2016 by leaving a copy of the Summons and Complaint with Harris' son, Dhafir Harris Jr., at

1

10421 SW 179th Street in Miami, Florida. McGlasson is a citizen of Illinois; BYB is a Florida limited liability company with its principal place of business in Florida. BYB has one member, Lights Out Productions, LLC ("Lights Out"). Lights Out consists of two members, Vazquez and Jose M. Suris, who are both citizens of Florida. Defendant Harris is a citizen of Florida. On July 12, 2016, Defendants BYB and Vazquez removed this action to the United States District Court for the Central District of Illinois under 28 U.S.C. §§ 1441 and 1332(a).[1]

*(A) Plaintiff's Complaint and Amended Complaint*

Unless otherwise noted, the following facts are taken from Plaintiff's Amended Complaint. Doc. 8. Plaintiff McGlasson is in the business of music production and promotion and he creates television and film concepts. He is also the founder of OIE Creative, an independent record label, and MYTVNOW.com, an independent web-based television startup company. In late 2011, McGlasson created the television series concept known as "Fightship," which involves mixed martial arts ("MMA") fighters in a tournament on board a ship sailing on international waters. Fightship was envisioned as a reality-based television series with global syndication, live pay-per-view events, and international mass-merchandising sales. In late 2012, McGlasson began working with Harris to secure a television production agreement for Fightship, featuring Harris as co-host and later as host of the series. In September 2013, McGlasson sent Harris copies of an agreement memorializing the alleged partnership between McGlasson, Harris, and Tineo, but Harris never signed the documents.

McGlasson and Harris worked together through January 31, 2015, after which the relationship fell apart and Harris ceased communication with McGlasson. During a January 31,

---

[1] Although Defendant Harris did not join in the removal, his Motion to Dismiss [17] asserts that he was not properly served. See 28 U.S.C. § 1446(b)(2)(A). However, because Plaintiff did not object, and the time for doing so has long passed, the Court need not address the issue. See 28 U.S.C. § 1447(c).

2015 phone call, Harris informed McGlasson that he had secured Vazquez as an investor and partner in BYB. Harris informed McGlasson during this call that Defendant Vazquez "loves Fightship" and wanted McGlasson to "get to Miami in the next two weeks to meet [Vazquez] and make a deal" regarding Fightship, and that they were ready to schedule the first BYB/Fightship event. On April 15, 2015, McGlasson overheard a telephone conversation between Harris and McGlasson's former business partner, Charlene Tineo, during which Harris allegedly told Tineo that "I'm stealing John (McGlasson's) idea, I'm doing it. This is the United States of America and I can do what I want." On April 25, 2015, BYB announced the Battleship I event, scheduled for June 5, 2015. It was billed as a mixed martial arts-style tournament fight on board a ship sailing off the Florida coast, which Plaintiff alleges is "a clear and blatant infringement upon the intellectual property created and owned by Plaintiff."

In the interim, Tineo began negotiating a production partnership with Ultimate Fighting Championship ("UFC") fighter Frank Shamrock, which would involve a production agreement with Viacom/Spike Network or a television network of similar or greater stature to air Fightship on television as early as 2016. During a March 6, 2015 phone call between Shamrock, Tineo, and McGlasson, Shamrock said that in exchange for his percentage of ownership in Fightship as part of the overall agreement, that he had access to funding from boxers such as Oscar Delahoya and Floyd Mayweather Jr., and that "[t]he president of Spike Network asked me directly to bring him combat-sports related content." On March 12, 2015, Tineo, Shamrock, his attorneys Montaneri and Musacchio, and McGlasson agreed upon partnership terms regarding the long-term production and marketing of the Fightship television series, which was to include the Fightship television series, live pay-per-view events, live events on land, and an extensive merchandise

line. Plaintiff does not state whether the meeting was in person, where it occurred, or where the contract was formed.

McGlasson made his new partners aware of the possible theft of Plaintiff's Fightship venture by Defendants' Battleship spinoff. All partners agreed that the Battleship I event could not be allowed to happen due to possible harm to Fightship's brand at a critical time during negotiations with investors, networks and production companies. All partners agreed that before legal action was taken, Shamrock should attempt to speak with Vazquez to work out an agreement where all parties would all partner together to produce Fightship. This was proposed by Shamrock to Vazquez during a phone call on May 17, 2015. Vazquez refused the offer on the phone call and in a later email. McGlasson also reached out to Vazquez via email on May 11, 2015, explaining that he had created the Fightship concept and had previously worked with Harris to secure a production agreement for Fightship. However, on May 11, 2015, Vazquez emailed Shamrock stating that he was going "full steam ahead" with their planned Battleship event at sea.

McGlasson served Defendants with a cease and desist order on May 11, 2015 and May 12, 2015 regarding the June 5, 2015 Battleship event.[2] Defendants continued to promote the event post-service. As the June 5, 2015 event drew near, Shamrock informed Tineo and McGlasson that many people in the MMA world were watching Defendants' event as a "trial run" for Fightship, and that if there was a tragic event which created "liability issues" or "image problems" for the brand, networks would be reluctant to produce Fightship. Defendants' event

---

[2] McGlasson's cease and desist letter, which was prepared by a California attorney, was the basis for a tortious interference action in a Florida state court. Ultimately, default judgment was entered against McGlasson after the Florida Circuit Court of the Eleventh Judicial Circuit in Miami-Date County found that McGlasson was properly served and failed to appear. See *BYB Extreme Fighting Series, LLC v. McGlasson*, Case No. 2015-013145 (Dec. 4, 2015).

took place as scheduled. Soon after Defendants' event, Shamrock informed McGlasson and Tineo that their "brand has been damaged, people know about the legal battle involving Fightship and nobody will touch Fightship until this is cleared up." Shamrock saw no choice but to dissolve the partnership and move on from the project.

Freelance writer Jeb Lund attended the June 5, 2015 Battleship event and wrote an article which was published in the August, 2015 issue of Rolling Stone Magazine entitled "BLOOD BOAT." Within this article, Harris describes in detail how he was inspired to found BYB and to hold fights at sea. Harris claims credit for the idea in the article and never mentions Plaintiff or the Fightship concept. Plaintiff alleges that "[t]he damage to Plaintiff's intellectual property through the direct actions of Defendants is terminal" and "Plaintiff's chances of securing a production contract for his Fightship concept are destroyed through the direct actions of Defendants."

McGlasson's Amended Complaint asserts claims for tortious interference with a prospective business relationship, implied contract and unjust enrichment, misappropriation of trade secrets, and for temporary and permanent injunctive relief.

*(B) BYB and Vazquez's Motion to Dismiss for Lack of Personal Jurisdiction*

On August 23, 2016, Defendants BYB and Vazquez filed a Motion to Dismiss (Doc. 9) and Memorandum in support (Doc. 10) alleging that this Court lacks personal jurisdiction over them. Therein, Defendants identify six contacts alleged by Plaintiff:

> (i) "one or more Defendants individually or in combination of efforts or results, placed a phone call into Illinois;" (ii) "one or more Defendants individually or in combination of efforts or results . . . sent numerous emails to Plaintiff about the subject matter of this case;" (iii) Plaintiff mailed numerous documents from Illinois to Florida that "Defendants never discouraged him from sending;" (iv) Plaintiff sent a "Cease and Desist" letter to Defendants from Illinois; and (v) Rolling Stone Magazine published an article about Defendants' Battleship I event. (Am. Cmpl. at p. 2.)

5

Doc. 10, at 3-4.

Defendants assert that the above contacts alleged by Plaintiff are insufficient to confer personal jurisdiction over them because BYB and Vazquez never communicated with McGlasson; rather, the contacts are between McGlasson and Harris or McGlasson and an unaffiliated non-party (Shamrock). Additionally, Defendants assert that McGlasson's claim that he mailed numerous documents to Defendants is insufficient to confer personal jurisdiction because it concerns the Plaintiff's activity, not the Defendants' activity.

*(C) Harris' Motion to Dismiss for Lack of Personal Jurisdiction and to Quash Service*

On March 2, 2017, after Plaintiff filed a Motion for Default Judgment against Defendant Harris (Doc. 15), Harris entered his appearance and filed a Motion to Dismiss and to Quash Service. Doc. 17. Therein, Harris raises arguments to those of BYB and Vazquez. Additionally, Harris asserts that he was not properly served. In support, Harris provides affidavits from himself and his son denying that either was ever served with the summons or complaint and alleging that the address identified in the process server's affidavit is not his primary residence.

**LEGAL STANDARD**

Courts have traditionally held that a complaint should not be dismissed unless it appears from the pleadings that the plaintiff could prove no set of facts in support of her claim which would entitle her to relief. See *Conley v. Gibson*, 355 U.S. 41 (1957); *Gould v. Artisoft, Inc.*, 1 F.3d 544, 548 (7th Cir. 1993). Rather, a complaint should be construed broadly and liberally in conformity with the mandate in the Federal Rules of Civil Procedure 8(e). More recently, the Supreme Court has phrased this standard as requiring a showing sufficient "to raise a right to relief beyond a speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). The claim for relief must be "plausible on its face." *Id.*; *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1953

(2009). For purposes of a motion to dismiss, the complaint is construed in the light most favorable to the plaintiff and all well-pleaded factual allegations are taken as true. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Hishon v. King & Spalding*, 467 U.S. 69 (1984); *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467 (7th Cir. 1997); *M.C.M. Partners, Inc. v. Andrews-Bartlett & Assoc., Inc.*, 62 F.3d 967, 969 (7th Cir. 1995); *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75 (7th Cir. 1992).

In addition to the pleading requirements, the defendant must be subject to the Court's jurisdiction. The Due Process Clause requires that individuals have "fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign," *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring), thus providing "a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); see also *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). As such, the "plaintiff bears the burden of demonstrating personal jurisdiction." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 942-45 (7th Cir. 2000). However, "[w]hen challenged at the motion to dismiss stage, the plaintiff need only make a prima facie showing of facts establishing personal jurisdiction." *United States ex rel Conyers v. Kellogg, Brown & Root, Inc.*, 2015 WL 1510544 (C.D. Ill. Mar. 30, 2015) (citing *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012)). Thus, the Court takes as true all well-pleaded facts alleged in the complaint and resolves any factual disputes in favor of the plaintiff. *Tamburo*, 601 F.3d at 700.

Where a "State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum, the State is exercising 'specific jurisdiction'

7

over the defendant." In contrast, "[w]hen a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum," the state is exercising 'general jurisdiction' over the defendant. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 9 (1984). And a federal district court exercising diversity jurisdiction has personal jurisdiction only to the extent that the court of the state in which it sits would have personal jurisdiction. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). Because the Illinois long-arm statute "permits the exercise of jurisdiction to the full extent permitted by the Fourteenth Amendment's Due Process Clause . . . the state statutory and federal constitutional inquiries merge." *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010); 735 ILCS 5/2-209.

"The nature of the purposeful-direction/purposeful-availment inquiry depends in large part on the type of claim at issue." *Felland v. Clifton*, 682 F.3d 665, 674 (7th Cir. 2012). In breach of contract suits, personal jurisdiction "generally turns on whether the defendant purposefully availed himself of the privilege of conducting business in the forum state." On the other hand, "[w]here a plaintiff's claim is for an intentional tort, 'the inquiry focuses on whether the conduct underlying the claim[ ] was purposefully directed at the forum state.'" *Felland*, 682 F.3d at 674 (quoting *Tamburo*, 601 F.3d at 702). Thus, with respect to intentional torts, the Seventh Circuit has identified three requirements from *Calder v. Jones* and *Tamburo* for determining whether conduct is "purposefully directed" at a forum state:

> (1) intentional conduct (or "intentional and allegedly tortious" conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state. 601 F.3d at 703. If the plaintiff makes these three showings, he has established that the defendant "purposefully directed" his activity at the forum state.
>
> *Felland v. Clifton*, 682 F.3d 665, 674–75 (7th Cir. 2012).

8

## ANALYSIS

Plaintiff asserts that this Court has personal jurisdiction over Defendants BYB and Vazquez because the actions of Defendant Harris, which Plaintiff asserts are imputed to BYB and Vazquez as agents or partners. Doc. 20, at 2. Thus, the Court will first address whether Plaintiff has met his burden of establishing personal jurisdiction over Defendant Harris.

*(A) Personal Jurisdiction with Respect to Defendant Harris*

As alleged in Plaintiff's Amended Complaint, accompanying affidavits, and responses, Harris' contacts with Illinois can be summarized as follows:

> On August 19, 2013, McGlasson sent an e-mail to which Harris responded on the same day, asking to see McGlasson's YouTube trailer for Fightship and indicating that he wanted to show it to others who might be interested in promoting the event. On August 20, 2013, McGlasson sent Harris the link for the trailer and indicated that it was set to "public" on YouTube. Harris confirmed that he was able to view the video. Doc. 20, at 3.
>
> McGlasson emailed Harris on September 9, 2013, informing him that he had received the agreement from Tineo, printed and signed three copies, and would be sending them to Harris for his signature. McGlasson asked Harris for his address, which Harris provided. McGlasson's phone number was listed in the e-mails showing an Illinois 815 area code, and in discussions with Harris, McGlasson informed him that he lived in Illinois Doc. 11, at 7.
>
> On January 19, 2015, Harris contacted McGlason about McGlasson's Fightship concept and idea. On January 31, 2015, Harris texted McGlasson and informed him of a deal he was making regarding Fightship and a new bare knuckle boxing series called BYB Extreme Fighting Series which he was founding with Vazquez from Miami, Florida. Doc. 11, at 2.
>
> During a January 31, 2015 phone call between Harris and McGlasson, Harris stated that he had secured Vazquez as an investor and partner in BYB and that Vazquez, "Loves Fightship" and wanted Plaintiff to travel to Miami in the following weeks to meet Vazquez and make a deal regarding Fightship, and that he was ready to schedule the first BYB/Fightship event. *Id*. at 2-3.
>
> On February 3, 2015, Harris texted McGlasson stating he would be contacting him again, but failed to do so. *Id*. at 7.

During an April 15, 2015 phone call between Harris and McGlasson's former business partner, Charlene Tineo, Harris told Tineo that he was stealing McGlasson's idea. *Id*. at 3-4.

During the June 5, 2015 Battleship event, Jeb Lund wrote an article which was published in the August, 2015 issue of Rolling Stone Magazine titled "BLOOD BOAT" wherein Harris describes in detail how he was inspired to found BYB and to hold fights at sea. Harris never mentions McGlasson or the Fightship concept within the article, which has been and will continue to be viewed by millions of people worldwide. *Id*. at 5.

In the context of intentional torts, which Plaintiff asserts in counts one and three of his Amended Complaint, "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014). Here, Plaintiff alleges that Defendants tortuously interfered with a prospective business relationship. Because the nature of a specific tort is relevant to the analysis of a defendant's alleged contacts, *Id*. at 1124, a brief discussion of the elements of an Illinois tortious interference claim is necessary. In order to state a claim for tortious interference with a prospective economic advantage under Illinois law, a plaintiff must prove "(1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511, 568 N.E.2d 870, 878 (1991).

The contacts alleged by McGlasson fall into three general categories: communications by Plaintiff to Harris, communications by Harris to third-parties, and communications by Harris to Plaintiff. In the context of intentional torts, it is "insufficient to rely on … the 'unilateral activity' of a plaintiff." *Id.*, citing *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985). Indeed, the Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum

contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum state." *Id.*, citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 455 U.S. 408, 417 (1984). Thus, McGlasson's emails and phone calls *to* Harris are not relevant to the jurisdictional analysis. Similarly, Harris' alleged statements to Tineo fall outside the scope of the personal jurisdiction analysis because Plaintiff does not allege any connection between Tieno and Illinois. And Harris' statements to the Rolling Stone, unlike the *Calder* defendants' libelous article in the National Enquirer, do not establish a contact with Illinois because they were not "expressly aimed" at Illinois. See *Walden*, 134. S. Ct. at 1124; cf. *Calder v. Jones*, 465 U.S. 783, 788-89 (1984). Accordingly, of the three categories of alleged contacts, only the last is relevant for jurisdictional purposes, and only if Harris' communications with Plaintiff show that Harris has formed a contact with Illinois. See *Walden*, 134 S. Ct. at 1125 ("Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State.").

Harris' contacts with Illinois are limited to his phone calls, text messages, and emails sent to McGlasson in Illinois. But see *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014) ("As a practical matter, email does not exist in any location at all; it bounces from one server to another, it starts wherever the account-holder is sitting when she clicks the "send" button, and it winds up wherever the recipient happens to be at that instant. The connection between the place where an email is opened and a lawsuit is entirely fortuitous."). These contacts include Harris' 2013 email to McGlasson asking for the link to the publicly available[3] YouTube video and follow-up email providing McGlasson with his Miami

---

[3] Although this matter is not before the Court on a motion to dismiss under Rule 12(b)(6), the Court notes that Plaintiff's admission that the video was publicly available likely dooms his trade secret claim. See 765 ILCS 1065/2(d) (defining trade secrets as information that "sufficiently secret" and "the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.").

address, Harris' January 2015 text message and phone call to McGlasson informing him of the creation of BYB with Vazquez, and Harris' February 2015 text message to McGlasson stating he would be contacting him again. Plaintiff also alleges that Harris was aware that McGlasson was from Illinois and his Illinois area code was present in each of the email exchanges.

In addition to the above contacts, Plaintiff claims that the effects of Harris' alleged tortious conduct caused Plaintiff to suffer an economic injury in Illinois. The essence of Plaintiff's claim is that Defendants, through Harris, "goaded Plaintiff into transmitting material that would show specifics of his idea which Defendants then took over for their own uses and tortious purposes." Doc. 20, at 10. The idea which McGlasson alleges Defendants appropriated was the Fightship concept. Specifically, McGlasson's tortious interference claim alleges that Defendants interfered with his expectation of entering a business relationship with Shamrock and Tineo. However, Plaintiff has not alleged that either Shamrock or Tineo have any connection with Illinois. Although McGlasson may have suffered an economic injury in Illinois, that alone is insufficient to establish personal jurisdiction. See *Walden*, 134 S. Ct. at 1125 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."). *Hang Glide USA, LLC v. Coastal Aviation Maint., LLC*, No. 16 C 6905, 2017 WL 1430617, at *3 (N.D. Ill. Apr. 18, 2017) ("There must be more than economic impact to support personal jurisdiction over Coastal or Stinson under the long-arm statute's due process requirement—a principle that our Court of Appeals has adhered to for at least three decades …").

Similarly, the Fightship concept itself had no relation to Illinois. As alleged in the Amended Complaint, McGlasson envisioned Fightship as an MMA tournament "on board a ship sailing on international waters." Doc. 8, at 3. The only geographic connection Illinois arguably

12

has to "international waters" would be Lake Michigan, but it is clear from Plaintiff's filings and the promotional video that Fightship was envisioned as an event "at sea," i.e., off the Florida coast. Thus, the effects of Defendants' allegedly tortious conduct would likely be greatest in Florida, not Illinois. In sum, the only connections Plaintiff alleges between Harris and Illinois are a handful of emails, text messages, and phone calls, and the fact that McGlasson, an Illinois resident, felt the economic impact of the alleged tort in Illinois. Plaintiff's argument "improperly attributes [McGlasson's] forum connections to the defendant and makes those connections "decisive" in the jurisdictional analysis." *Walden*, 134 S. Ct. at 1125. Harris' alleged conduct was not purposefully directed at Illinois, nor does it connect him to Illinois in a meaningful way. Accordingly, Harris' Motion to Dismiss must be granted.

*(B) Personal Jurisdiction with Respect to Defendants BYB and Vazquez*

Plaintiff asserts that this Court has personal jurisdiction over Defendants BYB and Vazquez because the actions of Defendant Harris, which Plaintiff asserts are imputed to BYB and Vazquez as their agent or partner. Doc. 20, at 2. "Personal jurisdiction over an entity is appropriate when minimum contacts are established through an agent of the entity." *Capgain Properties Inc. v. Landmaster Partners, LLC*, No. 15 C 9234, 2016 WL 3035534, at *2 (N.D. Ill. May 29, 2016) (citing *Wisconsin Elec. Mfg. Co. v. Pennant Prods., Inc.*, 619 F.2d 676. 677-78 (7th Cir. 1980)). However, as discussed above, Harris' contacts with Illinois are insufficient to confer personal jurisdiction over him.

Vazquez's contacts with Illinois—either individually, or as an agent for BYB—are nonexistent. Vazquez never traveled to Illinois, conducted activities within Illinois, contacted anyone in Illinois, or sent anything or anyone to Illinois. See *Walden*, 134 S. Ct. at 1124 ("Petitioner never traveled to, conducted activities within, contacted anyone in, or sent anything

or anyone to Nevada. In short, when viewed through the proper lens—whether the *defendant's* actions connect him to the *forum*—petitioner formed no jurisdictionally relevant contacts with Nevada."). Thus, the jurisdictional analysis with respect to Harris "confirms with even greater force that the fragmentary relationships with Illinois referred to in the previous [section] are insufficient to subject" Vazquez and BYB to suit in Illinois. *Hang Glide*, 2017 WL 1430617, at *3–4. Accordingly, the Motion to Dismiss by Defendants Vazquez and BYB must be granted as well.

*(C) Plaintiff's Motion for Default and Defendant Harris' Motion to Quash Service*

The last issue to be addressed is Plaintiff's Motion for Default with respect to Defendant Harris (Doc. 15), and Harris' Motion to Quash Service (Doc. 17). Rule 4 of the Federal Rules of Civil Procedure provides in relevant part, "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant … who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located …" Fed. R. Civ. P. 4(k). Because the Court finds that personal jurisdiction over Defendants is lacking, Plaintiff's Motion for Default against Harris must be denied, since a judgment against him would be void. See *Durukan America, LLC v. Rain Trading, Inc.*, 787 F.3d 1161, 1163 (7th Cir. 2015) ("[I]f the district court lacked personal jurisdiction over the defendant at the time it entered the default judgment, the judgment is void, and it is a per se abuse of discretion to deny a motion to vacate that judgment.") (internal citations omitted). Similarly, having found that personal jurisdiction over Harris is lacking, it is unnecessary to consider whether Harris was properly served.[4]

---

[4] For the same reasons, and because Plaintiff has not presented the court with a motion under Rule 11, the Court finds it unnecessary to provide a detailed analysis of Harris' representations in his affidavits. Suffice it to say they are troubling. See, e.g., Doc. 22-1, at 10 (twelve month lease with no terms, for $800 per month, for a total of $8,000). Nor is it necessary, assuming Harris was properly served, to consider whether he could show "good cause" for setting aside a default under Rule 55(c), or "just terms" for relief from a final judgment under Rule 60(b). The Florida court's balancing of those factors with respect to McGlasson would certainly be persuasive here.

## CONCLUSION

For the reasons set forth above, Defendants' BYB Extreme Fighting Series, LLC and Vazquez's Motion [9] to Dismiss and Defendant Harris' Motion [17] to Dismiss and Quash Service are GRANTED and Plaintiff McGlasson's Motion [15] for Default Judgment and Entry of Default against Defendant Harris is DENIED.

This matter is now terminated.

Signed on this 18th day of May, 2017.

s/ James E. Shadid
James E. Shadid
Chief United States District Judge
